**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CRAIG EDWARDS, | 19-cv-03990 |
| Plaintiff, | Honorable John Z. Lee |
| v. | |
| AMAZON.COM SERVICES LLC, | |
| Defendant. | |

**SECOND AMENDED COMPLAINT**

Now comes the Plaintiff, CRAIG EDWARDS, by and through his attorneys and for his First Amended Complaint against the Defendant, AMAZON.COM SERVICES, INC. f/k/a AMAZON.COM.DEDC, LLC, Plaintiff alleges and states as follows:

PRELIMINARY STATEMENT

1. This is an action for damages and equitable and injunctive relief for discrimination and unlawful retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, as amended, 42 U.S.C. § 1981(a), and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

4. All conditions precedent to this Court's jurisdiction have occurred or have been complied with. Specifically:

   a. Plaintiff filed a Charge of Discrimination, number 551-2018-03852, with

the Equal Employment Opportunity Commission ("EEOC") on September 20, 2018;

b. Said Charge of Discrimination was amended on December 4, 2018; and

c. The EEOC issued a Notice of Suit Rights to Plaintiff for said Charge of Discrimination on March 18, 2019.

## PARTIES

5. Plaintiff is an individual who at all relevant times resided in Flossmoor, Illinois.

6. On information and belief, Defendant is a corporation of the State of Delaware, which is registered with the Secretary of State to do business in Illinois, and whose principal place of business is located in Seattle, Washington.

7. Plaintiff and Defendant are both "persons" as defined in 42 U.S.C. § 2000e(a).

8. Defendant is an "employer" as defined in 42 U.S.C. § 2000e(b), as, on information and belief, it engaged in an industry affecting commerce and had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

9. Plaintiff is an "employee" as defined in 42 U.S.C. § 2000e(f), as he was an individual employed by an employer, the Defendant.

## BACKGROUND FACTS

10. Plaintiff is an African-American male.

11. Plaintiff began his employment with Defendant on or about October 11, 2011.

12. On or about February 5, 2018, Defendant assigned Plaintiff to the position of Outbound Operations Manager at the MDW7 Fulfillment Center ("MDW7") located in Monee, Illinois.

13. As an Operations Manager, Plaintiff oversaw approximately 300 employees of

Defendant and its related entities.

14. Plaintiff most recently worked the front half day shift at MDW7, which comprised every Sunday through Wednesday from 7:00 a.m. to 5:30 p.m.

15. In addition to Plaintiff, the front half day shift staff included eight Area Managers, seven Process Assistants, and his peer Operations Manager, Laura Pratt ("Pratt").

16. Plaintiff significantly improved the performance of the front half day shift during his tenure as one of its Operations Managers.

17. Defendant operates a system of performance analytics that allows Operations Managers to track the performance of their shifts at all times by the year, month, week, day, hour, and minute.

18. Defendant's performance analytics show that in January of 2018, the front half day shift was unstable.

19. However, during Plaintiff's tenure on the front half day shift from on or about February 18, 2018 through on or about April 15, 2018, the shift's performance improved by twenty-four percent (24%), thereby becoming the top-performing shift within MDW7.

20. Plaintiff also frequently and consistently received positive feedback from the front half day shift Area Managers who worked under him.

21. On or about March 26, 2018, during a pre-shift strategic planning meeting Jason Murphy ("Murphy"), Defendant's Senior Human Resources Manager, openly reprimanded Plaintiff for following a directive issued by Kevin Kirves ("Kirves"), Defendant's Regional Manager, even though Kirves holds a position within the company that is senior to both Plaintiff's and Murphy's positions.

22. Later that day same day, on or about March 26, 2018, Jeff Messenger ("Messenger"), the General Manager of MDW7, arranged an unscheduled a meeting with Plaintiff and Plaintiff's immediate supervisor, Jason Carter ("Carter"), a Senior Operations Manager.

3

23. Messenger told Plaintiff the purpose of the meeting was to discuss Plaintiff's failed performance as an Operations Manager, and stated that the front half day shift was falling apart.

24. During said meeting, Messenger also stated that Plaintiff's Area Managers had made complaints about Plaintiff to Messenger and Murphy, regarding Plaintiff and Pratt supposedly not working well together.

25. If any such complaints were actually made by Plaintiff's Area Managers, they are false.

26. Plaintiff responded to Messenger's claims by referring to Defendant's analytical data, which proved that the performance of the front half day shift had significantly improved during Plaintiff's tenure.

27. Plaintiff then requested that Messenger launch a full investigation into the claims that had been made against him. Messenger refused to launch an investigation, dismissing Plaintiff's request by simply responding, "No."

28. After said meeting Plaintiff investigated the claims himself in an attempt to uncover the truth and, if necessary, to improve his performance and correct any issues with the front half day shift.

29. Plaintiff spoke with each of his eight Area Managers, all of whom expressed that they had not escalated any concerns to either Murphy or Messenger.

30. Plaintiff then spoke with Pratt, who told him that she had made several informal complaints to Murphy and Messenger because she did not feel that Plaintiff worked well with her.

31. On or about March 27, 2018, Murphy berated Plaintiff in a pre-shift meeting in a biased and unfair manner. Murphy's actions did not align with Defendant's published leadership principles or with Defendant's Code of Conduct.

32. After that meeting, Brook Zhang ("Zhang"), one of Plaintiff's Area Managers,

expressed to Plaintiff that Murphy's actions had undermined Plaintiff's leadership and damaged Plaintiff's credibility.

33. Later that same day, Ashley Young ("Young"), Defendant's Human Resources Senior Business partner, failed to uphold her commitment to engage Plaintiff's subordinates in a "pulse survey," to gather feedback on his leadership strengths and weaknesses. The pulse survey is the standard tool used by Defendant to track its employees' leadership performance data.

34. Thereafter, Plaintiff followed up with Young three more times regarding collecting his leadership performance data, but Young continually failed to perform the pulse survey.

35. On or about April 3, 2018, Plaintiff emailed Carter to request that he remain on the front half day shift for the remainder of 2018 because it allowed him to support his wife during some extenuating family circumstances.

36. Plaintiff made this request because his wife's mother, who lived in Virginia, was terminally ill. Plaintiff wanted to remain on the Sunday through Wednesday front half day shift so that his wife could travel to Virginia on Plaintiff's days off to spend time with her mother, while Plaintiff remained at home to watch their four young children.

37. Carter responded favorably to Plaintiff's request and expressed support for Plaintiff's extenuating family circumstances.

38. On or about April 15, 2018, Carter told Plaintiff that he was being transferred to the back half night shift, which would require Plaintiff to work Thursday through Saturday from 6:00 p.m. to 6:00 a.m.

39. Much later, in or about October 1, 2018, Carter revealed to Plaintiff for the first time that this shift transfer was ordered by Messenger, and that Messenger had expressly told Carter that because Plaintiff was African-American and Pratt was a woman, both of them would

5

be transferred because they were members of protected classes.

40. Plaintiff protested this transfer, again citing Defendant's analytics, which show that the front half day shift improved significantly during Plaintiff's tenure as its Operations Manager. Plaintiff also asked why his previous request to stay on the front half day shift to accommodate his family's needs was not honored.

41. On information and belief, Messenger allowed at least four similarly situated non-African American Operations Managers, Matt Bryant, Sanjay Gupta, Anthony Tolbert and Philippi Lopez to stay on their current shifts when they requested it, to accommodate their families' circumstances.

42. On or about April 17, 2018, James Blanton ("Blanton"), a Senior Operations Manager, confronted Plaintiff in an attempt to intimidate him and told Plaintiff's subordinates to ignore Plaintiff's tactical directives, thereby reducing the shift's bottom-line performance.

43. Later that same day, Chris Roe ("Roe") and Mark Dague ("Dague"), two Senior Operations Managers, intimidated and humiliated Plaintiff during an Operations Manager meeting. Roe and Dague falsely accused Plaintiff of misconduct and then dismissed Plaintiff in front of his peers when Plaintiff challenged their statements.

44. During several senior-level meetings, Messenger openly expressed his intent to drive Plaintiff out of his position with Defendant by creating a hostile work environment for him.

45. During one such meeting Messenger openly stated that he planned to move Plaintiff to the back half night shift so that Dague could manage Plaintiff. Carter protested, stating that he was managing Plaintiff at that time, to which Dague replied that he would manage Plaintiff right out of the building.

46. On information and belief, Dague and Messenger continued to express their

intentions to drive Plaintiff out of his employment with Defendant over the course of other senior-level meetings.

47. On or about April 19, 2018, Plaintiff filed a formal internal ethics complaint with Defendant, pursuant to Defendant's ethics reporting policies, alleging race and sex discrimination, workplace harassment, and hostile work environment.

48. Garrett DuPont ("DuPont"), a Human Resources Business Partner, headed the investigation into Plaintiff's ethics complaint.

49. While DuPont conducted the investigation into Plaintiff's claims, Plaintiff took a three-week vacation to avoid any further workplace conflicts and to avoid his employment being terminated.

50. On or about May 31, 2018, DuPont stated that Plaintiff's claims were unsubstantiated and that no factual evidence indicated any violation of Defendant's policies.

51. On information and belief, DuPont did not conduct interviews of relevant witnesses, nor did he review important documentation, nor did he explore corroborating evidence, computer records, and other important data and information, as required by Defendant's investigation guidelines.

52. On information and belief, DuPont's only attempt to investigate Plaintiff's claims involved interviewing Messenger, Roe, and Dague.

53. In the face of DuPont's incomplete investigation, Plaintiff took 12 weeks of unpaid time off, pursuant to Defendant's personal leave of absence policy.

54. On or about May 30, 2018, Defendant informed Plaintiff that if he was unable to secure a new position with Defendant by September 21, 2018, he would be terminated. At that time, Defendant informed Plaintiff that it was his responsibility to find a new position within the

company.

55. On information and belief, similarly situated employees were given assistance in obtaining new positions within the company, which was not given to Plaintiff.

56. As early as May 30, 2018, Plaintiff began applying for different positions with Defendant within Illinois.

57. Despite having made approximately 15 applications for other employment positions with Defendant in Illinois, Plaintiff was unable to secure a new position.

58. On or about August 22, 2018, Plaintiff spoke with Mike Stevens ("Stevens"), Defendant's Director of Human Resources for North American. During that conversation Stevens agreed to help Plaintiff secure a new position.

59. However, on information and belief, Stevens made no attempts to help Plaintiff secure a new position as he had promised.

60. On or about September 17, 2018, Plaintiff filed a second formal ethics complaint, pursuant to Defendant's policies, citing the incomplete investigation outlined above.

61. On or about September 9, 2018, Plaintiff filed his initial charge of discrimination with the EEOC.

62. Plaintiff's employment was not terminated on September 21, 2018, as had been previously threatened. For the time, Plaintiff remained an employee of Defendant.

63. On or about November 6, 2018, Plaintiff was informed that he would be considered for an AWCS Deployment Manager position with Defendant.

64. At that time, Plaintiff was informed by Jessica Smaagaard ("Smaagaard"), Defendant's Regional Human Resource Manager, that if he was not chosen for the AWCS Deployment Manager position, then his employment with Defendant would be terminated.

65. On or about November 29, 2018, Plaintiff was informed that he was not selected for the AWCS Deployment Manager position.

66. On or about December 1, 2018, Plaintiff filed an amended Charge of Discrimination with the EEOC against Defendant, alleging race and sex discrimination and retaliation.

67. Plaintiff's employment was involuntarily terminated on or about December 1, 2018 even though Plaintiff was willing to return to his original position despite Defendant failing to notify him of steps to that it would take to protect him for further retaliation and discrimination.

68. Defendant's stated reason for terminating Plaintiff was that Plaintiff had failed to secure a new position with Defendant.

69. Defendant's stated reason for terminating Plaintiff was pretextual.

70. This is a proceeding for declaratory judgment as to Plaintiff's right of a permanent injunction restraining Defendant from maintaining a policy, practice, usage or custom of discriminating against Plaintiff because of his race and/or sex with respect to compensation, terms, conditions, and/or privileges of employment, depriving Plaintiff of equal employment opportunities, and otherwise adversely affect his status as an employee, because of his race and/or sex. This Complaint also seeks restitution to Plaintiff for the denial of all of his rights, privileges, benefits, and income that would have been received by Plaintiff but for Defendant's unlawful and illegal discriminatory acts and practices.

71. Plaintiff has no plain, adequate, or complete remedy at law to address the wrongs alleged herein, and this suit for injunctive relief is his only means of securing adequate relief. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's policy, practice, custom, and usage as set forth herein, unless and until it is enjoined by the Court.

## COUNT I
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 DUE TO

**DISCRIMINATION**

72. Plaintiff incorporates all of the allegations and statements contained in paragraphs 1 through 71 above as if reiterated herein.

73. Defendant, in violation of 42 U.S.C. § 2000e, has denied and continues to deny Plaintiff an equal opportunity for employment due to his race, African-American, and/or his sex, male.

74. During Plaintiff's employment with Defendant, he was subjected to discrimination based on his race in that there was a double-standard between the treatment of African-American employees and other employees.

75. During Plaintiff's employment with Defendant, he was subjected to discrimination on the basis of his sex in that there was a double-standard between the treatment of male and female employees.

76. The discriminatory treatment to which Plaintiff was subjected includes, but is not limited to, the instances alleged above. All of the actions of the individuals described herein were undertaken in their capacities as the employees, agents, and/or authorized representatives of Defendant.

77. Defendant, through its employees, agents, and/or authorized representatives, knew that its termination and discriminatory treatment of Plaintiff because of his race and/or sex violated Title VII.

**COUNT II**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 DUE TO RETALIATION**

78. Plaintiff incorporates all of the allegations and statements contained in paragraphs 1 through 77 above as if reiterated herein.

79. Defendant, in violation of 42 U.S.C. § 2000e, has denied and continues to deny Plaintiff an equal opportunity for employment in retaliation for voicing complaints (both internally and to the EEOC) about, and for expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him.

80. During Plaintiff's employment with Defendant and when Plaintiff was terminated by Defendant, he was subjected to discrimination and retaliation for engaging in legally- protected activities, as set forth above.

81. The retaliatory treatment to which Plaintiff was subjected includes, but is not limited to, the instances alleged above. All of the actions of the individuals described herein were undertaken in their capacities as the employees, agents, and/or authorized representatives of Defendant.

82. Defendant, through its employees, agents and/or authorized representatives, knew that its retaliation, termination, and discriminatory treatment of Plaintiff because of his voicing complaints (both internally and to the EEOC) about, and expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him, violated Title VII.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1981
## DUE TO DISCRIMINATION

83. Plaintiff incorporates all of the allegations and statements contained in paragraphs 1 through 82 above as if reiterated herein.

84. 42 U.S.C. § 1981 provides that "all persons" shall have the same right to "make and enforce contracts" as "white citizens" 42 U.S.C. § 1981 (a). The term "make and enforce contracts" includes "the making, enforcement, modification, and termination of contracts, and the enjoyment

of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

85. As alleged above, by discriminating against Plaintiff on the basis of his race, Defendant, in violation of 42 U.S.C. § 1981, has denied and continues to deny Plaintiff's right to "make and enforce contracts" the same as "white citizens" including enjoyment of all the benefits, privileges, terms and conditions of the contractual relationship between himself and Defendant. During Plaintiff's employment with Defendant, he was subjected to discrimination based on his race in that there was a double standard between the treatment of African-American employees and Caucasian employees.

86. Defendant's intentional discrimination against Plaintiff on the basis of his race prevented him from enjoying the full benefit of the terms and conditions of his employment.

87. Defendant's acts were intentional, willful, and malicious, and in disregard to Plaintiff's federally-protected civil rights.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1981
## DUE TO RETALIATION

88. Plaintiff incorporates all of the allegations and statements contained in paragraphs 1 through 88 above as if reiterated herein.

89. 42 U.S.C. § 1981 provides that "all persons" shall have the same right to "make and enforce contracts" as "white citizens" 42 U.S.C. § 1981(a). The term "make and enforce contracts" includes "the making, enforcement, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

90. As alleged above, by retaliating against Plaintiff for voicing complaints (both internally and to the EEOC) about, and for expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him, Defendant, in violation of 42 U.S.C. § 1981, has denied and continues to deny Plaintiff's right to

"make and enforce contracts" the same as "white citizens" including enjoyment of all the benefits, privileges, terms and conditions of the contractual relationship between himself and Defendant.

91. During Plaintiff's employment with Defendant, he was subjected to retaliation for voicing complaints (both internally and to the EEOC) about, and for expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him.

92. Defendant's intentional retaliation against Plaintiff for the reasons set forth above prevented him from enjoying the full benefit of the terms and conditions of his employment.

93. Defendant's acts were intentional, willful, and malicious, and in disregard to Plaintiff's federally-protected civil rights.

Wherefore, Plaintiff CRAIG EDWARDS, respectfully prays this Honorable Court enter judgment against Defendant, AMAZON.COM SERVICES, INC. f/k/a AMAZON.COM.DEDC, LLC, as follows:

    a. Declaring the Defendant's practices complained of herein unlawful and in violation of Title VII, as well as 42 U.S.C. § 1981;

    b. Permanently enjoining Defendant, its agents, successors, officers, employees, representatives, attorneys, and those acting in concert with it or them from engaging in the unlawful practices, policies, customs, and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

    c. Ordering modification or elimination of the practices, policies, customs, and usages set forth herein, and all other such practices shown to be in violation of applicable law, ensuring Defendant will not continue to discriminate on the basis of race or sex, nor unlawfully retaliate against its employees;

    d.    Immediately assigning Plaintiff to the position he would now be occupying but for the discriminatory and retaliatory practices of Defendant, and adjusting the wage rates, salaries, bonuses, and benefits for Plaintiff to those which he would have received but for the discriminatory and retaliatory practices of Defendant, or awarding Plaintiff front-end and future pay;

    e.    Compensating and making Plaintiff whole for all earnings, wages, bonuses, and other benefits that Plaintiff would have received but for the discriminatory and retaliatory practices of Defendant;

    f.    Compensating and making Plaintiff whole for all other damages Plaintiff incurred as a result of the discriminatory and retaliatory practices of Defendant;

    g.    Awarding Plaintiff all witness fees, court costs, and other litigation costs incurred in this Action, including reasonable attorneys' fees; and

    h.    Awarding Plaintiff compensatory and punitive damages for Defendant's willful conduct, and granting such other relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues in this action so triable, except for any issues relating to the amount of attorneys' fees and litigation costs to be awarded should Plaintiff prevail on any of his claims in this action.

    CRAIG EDWARDS

    By:   /s/ Peter S. Lubin
          One of his attorneys

**CERTIFICATE OF SERVICE**

      I, Peter S. Lubin, the undersigned attorney, hereby certify that on December 1, 2020, I caused a true and correct copy of the foregoing Second Amended Complaint to be served upon all counsel via the Court's CM/ECF System.

                                                  /s/ Peter S. Lubin