**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CRAIG EDWARDS, | 19-cv-03990 |
| Plaintiff, | Honorable John Z. Lee |
| v. | **TRIAL BY JURY DEMANDED** |
| AMAZON.COM SERVICES LLC, | |
| Defendant. | |

**THIRD AMENDED COMPLAINT**

Plaintiff, CRAIG EDWARDS, by his undersigned attorneys, and for his Third Amended

Complaint against Defendant, AMAZON.COM SERVICES, INC. f/k/a AMAZON.COM.DEDC,

LLC, alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for damages and equitable and injunctive relief for discrimination

and unlawful retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e, *et seq.*, as amended, 42 U.S.C. § 1981(a), and the Civil Rights Act of 1866, 42

U.S.C. § 1981.

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

4.      All conditions precedent to this Court's jurisdiction have occurred or have been

complied with. Specifically:

        a.      Plaintiff filed a Charge of Discrimination, number 551-2018-03852, with

the Equal Employment Opportunity Commission ("EEOC") on September 20, 2018;

b.      Said Charge of Discrimination was amended on December 4, 2018; and

c.      The EEOC issued a Notice of Suit Rights to Plaintiff for said Charge of Discrimination on March 18, 2019.

## PARTIES

5.      Plaintiff is an individual who at all relevant times resided in Flossmoor, Illinois.

6.      Defendant is a corporation of the State of Delaware, which is registered with the Secretary of State to do business in Illinois, and whose principal place of business is located in Seattle, Washington.

7.      Plaintiff and Defendant are both "persons" as defined in 42 U.S.C. § 2000e(a).

8.      Defendant is an "employer" as defined in 42 U.S.C. § 2000e(b), as, on information and belief, it engaged in an industry affecting commerce and had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

9.      Plaintiff is an "employee" as defined in 42 U.S.C. § 2000e(f), as he was an individual employed by an employer, the Defendant.

## BACKGROUND FACTS

10.      Plaintiff is an African American male. He is the victim of a plan by Jeff Messenger (the head of the Amazon warehouse in Monee, Illinois and who was raised in the Deep South) to drive Plaintiff out of Amazon because he is an African American. Messenger did not make his distaste for African Americans a secret. To put a senior African American manager in his place, Messenger recounted a story of how he had insulted President Barack Obama. Exhibit A.

11.      Messenger decided to drive Plaintiff out of Amazon because a white woman

manager, also of Southern heritage, made false complaints about Plaintiff to scapegoat him so she could escape the consequences of her poor performance. Amazon then engaged in a white-wash investigation to protect Messenger (who a number of other Amazon employees has accused of racism) and hide his discriminatory behavior and harassment of Plaintiff. In engaging in this conduct, Amazon ignored that that Plaintiff had worked for Amazon for 7 ½ years and been consistently rated as a top 10% performer, who was beloved by his direct reports some of whom viewed Plaintiff as the best manager for whom they had ever worked. Amazon did not reopen its investigation after Messenger's plan to drive Plaintiff out of Amazon was fully exposed and reported by Plaintiff directly to Jeff Bezos. Bezos's special investigation team simply rubber stamped the prior inadequate investigation and did not conduct a single witness interview. Amazon with the full approval of Bezos, through his special investigation team, fired Plaintiff in retaliation for Plaintiff blowing the whistle on the plan to drive him out of Amazon. See Exhibit A.

12.     Amazon has rewarded the wrongdoers and punished Plaintiff for blowing the whistle on the racist conduct from which he was suffering, by firing him. Amazon promoted Messenger and many of his co-conspirators to higher levels at Amazon. Amazon still has taken no action against the wrongdoers, even after Messenger in deposition testimony did not deny the racist plot and simply claimed he could not recall if he had instructed his team to drive Plaintiff out of Amazon. Messenger testified that he was not disputing the testimony, outlined in Exhibit A hereto, that he engaged in a plan to drive Plaintiff out of Amazon, but simply that he could not remember.

13.     Plaintiff began his employment with Defendant Amazon on or about October 11, 2011.

14.     On or about February 5, 2018, Defendant assigned Plaintiff to the position of Outbound Operations Manager at the MDW7 Fulfillment Center ("MDW7") located in Monee,

Illinois.

15.     As an Operations Manager, Plaintiff oversaw approximately 300 employees of Defendant and its related entities.

16.     Plaintiff most recently worked the front half day shift at MDW7, which comprised every Sunday through Wednesday from 7:00 a.m. to 5:30 p.m.

17.     In addition to Plaintiff, the front half day shift staff included eight Area Managers, seven Process Assistants, and his peer Operations Manager, Laura Pratt ("Pratt").

18.     Plaintiff significantly improved the performance of the front half day shift during his tenure as one of its Operations Managers.

19.     Defendant operates a system of performance analytics that allows Operations Managers to track the performance of their shifts at all times by the year, month, week, day, hour, and minute.

20.     Defendant's performance analytics show that in January of 2018, the front half day shift was unstable.

21.     However, during Plaintiff's tenure on the front half day shift from on or about February 18, 2018 through on or about April 15, 2018, the shift's performance improved by well over twenty-four percent (24%) by as much as thirty-four percent (34%), thereby becoming the top-performing outbound shift within MDW7. Its ranking jumped from near the bottom to the top even though all the shifts' performance was going up.

22.     Plaintiff also frequently and consistently received positive feedback from the front half day shift Area Managers who worked under him.

23.     On or about March 26, 2018, during a pre-shift strategic planning meeting Jason Murphy ("Murphy"), Defendant's Senior Human Resources Manager, openly reprimanded Plaintiff for following a directive issued by Kevin Kirves ("Kirves"), Defendant's Regional Manager, even though

Kirves holds a position within the company that is senior to both Plaintiff's and Murphy's positions.

24.     Later that day same day, on or about March 26, 2018, Jeff Messenger ("Messenger"), the General Manager of MDW7, arranged an unscheduled a meeting with Plaintiff and Plaintiff's immediate supervisor, Jason Carter ("Carter"), a Senior Operations Manager.

25.     Messenger told Plaintiff the purpose of the meeting was to discuss Plaintiff's failed performance as an Operations Manager and stated that the front half day shift was falling apart.

26.     During said meeting, Messenger falsely stated that Plaintiff's Area Managers had made complaints about Plaintiff to Messenger and Murphy, regarding Plaintiff and Pratt supposedly not working well together.

27.     Such complaints were not actually made by Plaintiff's Area Managers and these statements were false.

28.     Plaintiff responded to Messenger's claims by referring to Defendant's analytical data, which proved that the performance of the front half day shift had significantly improved during Plaintiff's tenure.

29.     Plaintiff then requested that Messenger launch a full investigation into the claims that had been made against him. Messenger refused to launch an investigation, dismissing Plaintiff's request by simply responding, "No."

30.     After said meeting Plaintiff investigated the claims himself to try to uncover the truth and, if necessary, to improve his performance and correct any issues with the front half day shift.

31.     Plaintiff spoke with each of his eight Area Managers, all of whom expressed that they had not escalated any concerns to either Murphy or Messenger.

32.     Plaintiff then spoke with Pratt, who told him that she had made several informal complaints to Murphy and Messenger because she did not feel that Plaintiff worked well with her.

5

33.     On or about March 27, 2018, Murphy berated Plaintiff in a pre-shift meeting in a biased and unfair manner. Murphy's actions did not align with Defendant's published leadership principles or with Defendant's Code of Conduct.

34.     After that meeting, Brook Zhang ("Zhang"), one of Plaintiff's Area Managers, expressed to Plaintiff that Murphy's actions had undermined Plaintiff's leadership and damaged Plaintiff's credibility.

35.     Later that same day, Ashley Young ("Young"), Defendant's Human Resources Senior Business partner, failed to uphold her commitment to engage Plaintiff's subordinates in a "pulse survey," to gather feedback on his leadership strengths and weaknesses. The pulse survey is the standard tool used by Defendant to track its employees' leadership performance data.

36.     Thereafter, Plaintiff followed up with Young three more times regarding collecting his leadership performance data, but Young continually failed to perform the pulse survey.

37.     On or about April 3, 2018, Plaintiff emailed Carter to request that he remain on the front half day shift for the remainder of 2018 because it allowed him to support his wife during some extenuating family circumstances.

38.     Plaintiff made this request because his wife's mother, who lived in Virginia, was terminally ill. Plaintiff wanted to remain on the Sunday through Wednesday front half day shift so that his wife could travel to Virginia on Plaintiff's days off to spend time with her mother, while Plaintiff remained at home to watch their four young children.

39.     Carter responded favorably to Plaintiff's request and expressed support for Plaintiff's extenuating family circumstances.

40.     A few days before April 15, 2018, Messenger informed Carter that he would be transferring Edwards and Pratt to the night shift because both were protected minorities at Amazon

because he was tired of the situation (which was caused by Pratt's secret escalations to him.) Messenger also made the decision to remove Edwards from eligibility for a promotion without documenting the reasons for the same would normal policy and practice at Amazon.

41.     On or about April 15, 2018, Carter told Plaintiff that he was being transferred to the back half night shift, which would require Plaintiff to work Thursday through Saturday from 6:00 p.m. to 6:00 a.m., that Messenger would not grant Plaintiff's hardship request and that Messenger was trying to ostracize Plaintiff out of the building or Amazon.

42.     Plaintiff protested this transfer, again citing Defendant's analytics, which show that the front half day shift improved significantly during Plaintiff's tenure as its Operations Manager. Plaintiff also asked why his previous request to stay on the front half day shift to accommodate his family's needs was not honored.

43.     Much later, in or about late September 2018, Carter revealed to Plaintiff for the first time that this shift transfer was ordered by Messenger, and that Messenger had expressly told Carter that because Plaintiff was African American and Pratt was a woman, both of them would be transferred because they were members of protected classes.

44.     On information and belief, Messenger allowed at least four similarly situated non-African American Operations Managers, Matt Bryant, Sanjay Gupta, Anthony Tolbert, and Philippi Lopez to stay on their current shifts when they requested it, to accommodate their families' circumstances.

45.     On or about April 17, 2018, James Blanton ("Blanton"), a Senior Operations Manager, confronted Plaintiff to intimidate him and told Plaintiff's subordinates to ignore Plaintiff's tactical directives, thereby reducing the shift's bottom-line performance.

46.     Later that same day, Chris Roe ("Roe") and Mark Dague ("Dague"), two Senior

7

Operations Managers, intimidated and humiliated Plaintiff during an Operations Manager meeting. Roe and Dague falsely accused Plaintiff of misconduct and then dismissed Plaintiff in front of his peers when Plaintiff challenged their statements.

47.     During the senior manager meeting some days before April 15, 2018, when Messenger announced that he planned to move Plaintiff to the back half night shift so that Dague could manage Plaintiff, Dague replied that he would manage Plaintiff right out of the building. Messenger did not reprimand Dague for this statement and made clear he supported the plan to manage Edwards out of the building. See Exhibit A.

48.     On or about April 19, 2018, Plaintiff filed a formal internal ethics complaint with Defendant, pursuant to Defendant's ethics reporting policies, alleging race and sex discrimination, workplace harassment, and hostile work environment. Plaintiff later updated his ethics complaints a number of times before he was wrongfully fired. Plaintiff's final update which Amazon failed to investigate at all reported Messenger's racist plot to manage him out of the building.

49.     Garrett DuPont ("DuPont"), a Human Resources Business Partner, headed the investigation into Plaintiff's ethics complaint.

50.     While DuPont conducted the investigation into Plaintiff's claims, Plaintiff took a three-week vacation to avoid any further workplace conflicts and to avoid his employment being terminated.

51.     On or about May 31, 2018, DuPont stated that Plaintiff's claims (other than then the claim he was given a proper hardship accommodation) were unsubstantiated and that no factual evidence indicated any violation of Defendant's policies. As to the hardship claim, DuPont found that substantiated but falsely blamed miscommunications and improper action by Plaintiff's direct manager Carter for the failure to accommodate Plaintiff, even though the evidence demonstrated

8

that the fault lay only with Messenger.  Exhibit A.

52.    DuPont did not conduct interviews of relevant witnesses, nor did he review important documentation, nor did he explore corroborating evidence, computer records, and other important data and information, as required by Defendant's investigation guidelines. Dupont also did not investigate new material allegations raised by Plaintiff such as plan to manage Plaintiff out of Amazon after Plaintiff uncovered that plan. Months later, when Plaintiff complained directly to Jeff Bezos about DuPont's failure to conduct an investigation in line with Amazon policies and of the plan to drive him out of Amazon, Bezos's special investigation team simply rubber-stamped DuPont's incomplete investigation even though DuPont never investigated Messenger's plan to drive Plaintiff out of Amazon as detailed in Exhibit A hereto.

53.    In the face of DuPont's incomplete investigation, Plaintiff took 12 weeks of unpaid time off, pursuant to Defendant's personal leave of absence policy.

54.    On or about May 30, 2018, Defendant informed Plaintiff that if he was unable to secure a new position with Defendant by September 21, 2018, he would be terminated. At that time, Defendant informed Plaintiff that it was his responsibility to find a new position within the company.

55.    On information and belief, similarly, situated employees were given assistance in obtaining new positions within the company, which was not given to Plaintiff.

56.    As early as May 30, 2018, Plaintiff began applying for different positions with Defendant within Illinois.

57.    Despite having made approximately 15 applications for other employment positions with Defendant in Illinois, Plaintiff was unable to secure a new position in all likelihood due to Messenger having falsely labeled Plaintiff as a struggling employee with communication gaps.

58.    On or about August 22, 2018, Plaintiff spoke with Mike Stevens ("Stevens"), Defendant's Director of Human Resources for North American. During that conversation Stevens agreed to help Plaintiff secure a new position.

59.    However, Stevens made no attempts to help Plaintiff secure a new position as he had promised and did not disclose that Amazon had marked Plaintiff as a struggling employee with substantial communication gaps.

60.    On or about September 17, 2018, Plaintiff filed a second formal ethics complaint, pursuant to Defendant's policies, citing the incomplete investigation outlined above. Defendant never investigated this charge.

61.    On or about September 9, 2018, Plaintiff filed his initial charge of discrimination with the EEOC.

62.    Plaintiff's employment was not terminated on September 21, 2018, as had been previously threatened. For the time, Plaintiff remained an employee of Defendant.

63.    On or about November 6, 2018, Plaintiff was informed that he would be considered for an AWCS Deployment Manager position with Defendant.

64.    At that time, Plaintiff was informed by Jessica Smaagaard ("Smaagaard"), Defendant's Regional Human Resource Manager, that if he was not chosen for the AWCS Deployment Manager position, then his employment with Defendant would be terminated.

65.    On or about November 29, 2018, Plaintiff was informed that he was not selected for the AWCS Deployment Manager position.

66.    On or about December 1, 2018, Plaintiff filed an amended Charge of Discrimination with the EEOC against Defendant, alleging race and sex discrimination and retaliation which also outlined the plan to drive him out of Amazon.

10

67.     Plaintiff's employment was involuntarily terminated on or about December 1, 2018 even though Plaintiff was willing to return to his original position despite Defendant failing to notify him of steps to that it would take to protect him for further retaliation and discrimination. Because Plaintiff had been on a leave of absence Amazon would have still included him in the budget for his position and the Monee, Illinois warehouse, and had a policy of keeping his position open as it did for any employee on leave. Exhibit A.

68.     Defendant's stated reason for terminating Plaintiff was that Plaintiff had failed to secure a new position with Defendant even though under its normal procedures his former position should have remained opened.

69.     Defendant's stated reason for terminating Plaintiff was pretextual.

70.     This is a proceeding for declaratory judgment as to Plaintiff's right of a permanent injunction restraining Defendant from maintaining a policy, practice, usage or custom of discriminating against Plaintiff because of his race and/or sex with respect to compensation, terms, conditions, and/or privileges of employment, depriving Plaintiff of equal employment opportunities, and otherwise adversely affect his status as an employee, because of his race and/or sex. This Complaint also seeks restitution to Plaintiff for the denial of all of his rights, privileges, benefits, and income that would have been received by Plaintiff but for Defendant's unlawful and illegal discriminatory acts and practices.

71.     Plaintiff has no plain, adequate, or complete remedy at law to address the wrongs alleged herein, and this suit for injunctive relief is his only means of securing adequate relief. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's policy, practice, custom, and usage as set forth herein, unless and until it is enjoined by the Court.

**COUNT I**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 DUE TO**
**DISCRIMINATION**

72.     Plaintiff incorporates all allegations contained in paragraphs 1 through 71.

73.     Defendant, in violation of 42 U.S.C. § 2000e, has denied and continues to deny Plaintiff an equal opportunity for employment due to his race, African American, and/or his sex, male.

74.     During Plaintiff's employment with Defendant, he was subjected to discrimination based on his race in that there was a double standard between the treatment of African American employees and other employees.

75.     During Plaintiff's employment with Defendant, he was subjected to discrimination on the basis of his sex in that there was a double standard between the treatment of male and female employees.

76.     The discriminatory treatment to which Plaintiff was subjected includes, but is not limited to, the instances alleged above. All the actions of the individuals described herein were undertaken in their capacities as the employees, agents, and/or authorized representatives of Defendant.

77.     Defendant, through its employees, agents, and/or authorized representatives, knew that its termination and discriminatory treatment of Plaintiff because of his race and/or sex violated Title VII.

**COUNT II**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 DUE TO**
**RETALIATION**

78.     Plaintiff incorporates all the allegations contained in paragraphs 1 through 77.

79.     Defendant, in violation of 42 U.S.C. § 2000e, has denied and continues to deny

Plaintiff an equal opportunity for employment in retaliation for voicing complaints (both internally and to the EEOC) about, and for expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him.

80.     During Plaintiff's employment with Defendant and when Plaintiff was terminated by Defendant, he was subjected to discrimination and retaliation for engaging in legally- protected activities, as set forth above.

81.     The retaliatory treatment to which Plaintiff was subjected includes, but is not limited to, the instances alleged above. All the actions of the individuals described herein were undertaken in their capacities as the employees, agents, and/or authorized representatives of Defendant.

82.     Defendant, through its employees, agents and/or authorized representatives, knew that its retaliation, termination, and discriminatory treatment of Plaintiff because of his voicing complaints (both internally and to the EEOC) about, and expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him, violated Title VII.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1981
## DUE TO DISCRIMINATION

83.     Plaintiff incorporates all allegations contained in paragraphs 1 through 82.

84.     42 U.S.C. § 1981 provides that "all persons" shall have the same right to "make and enforce contracts" as "white citizens" 42 U.S.C. § 1981 (a). The term "make and enforce contracts" includes "the making, enforcement, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

85.     As alleged above, by discriminating against Plaintiff on the basis of his race,

Defendant, in violation of 42 U.S.C. § 1981, has denied and continues to deny Plaintiff's right to "make and enforce contracts" the same as "white citizens" including enjoyment of all the benefits, privileges, terms and conditions of the contractual relationship between himself and Defendant. During Plaintiff's employment with Defendant, he was subjected to discrimination based on his race in that there was a double standard between the treatment of African American employees and Caucasian employees.

86.     Defendant's intentional discrimination against Plaintiff on the basis of his race prevented him from enjoying the full benefit of the terms and conditions of his employment.

87.     Defendant's acts were intentional, willful, and malicious, and in disregard to Plaintiff's federally protected civil rights.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1981**
**DUE TO RETALIATION**

88.     Plaintiff incorporates all the allegations contained in paragraphs 1 through 87.

89.     42 U.S.C. § 1981 provides that "all persons" shall have the same right to "make and enforce contracts" as "white citizens" 42 U.S.C. § 1981(a). The term "make and enforce contracts" includes "the making, enforcement, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

90.     As alleged above, by retaliating against Plaintiff for voicing complaints (both internally and to the EEOC) about, and for expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him, Defendant, in violation of 42 U.S.C. § 1981, has denied and continues to deny Plaintiff's right to "make and enforce contracts" the same as "white citizens" including enjoyment of all the benefits, privileges, terms and conditions of the contractual relationship between himself and Defendant.

91.     During Plaintiff's employment with Defendant, he was subjected to retaliation for

voicing complaints (both internally and to the EEOC) about, and for expressing concern over, the discrimination he was facing, and for demanding changes to the discriminatory behavior directed towards him.

92.     Defendant's intentional retaliation against Plaintiff for the reasons set forth above prevented him from enjoying the full benefit of the terms and conditions of his employment.

93.     Defendant's acts were intentional, willful, and malicious, and in disregard to Plaintiff's federally protected civil rights.

Wherefore, Plaintiff CRAIG EDWARDS, respectfully prays this Honorable Court enter judgment against Defendant, AMAZON.COM SERVICES, INC. f/k/a AMAZON.COM.DEDC, LLC, as follows:

a.     Declaring the Defendant's practices complained of herein unlawful and in violation of Title VII, as well as 42 U.S.C. § 1981;

b.     Permanently enjoining Defendant, its agents, successors, officers, employees, representatives, attorneys, and those acting in concert with it  or them from engaging in the unlawful practices, policies, customs, and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

c.     Ordering modification or elimination of the practices, policies, customs, and usages set forth herein, and all other such practices shown to be in violation of applicable law, ensuring Defendant will not continue to discriminate on the basis of race or sex, nor unlawfully retaliate against its employees;

d.     Immediately assigning Plaintiff to the position he would now be occupying but for the discriminatory and retaliatory practices of Defendant, and adjusting the wage rates, salaries, bonuses, and benefits for Plaintiff to those

which he would have received but for the discriminatory and retaliatory practices of Defendant, or awarding Plaintiff front-end and future pay;

e.      Compensating and making Plaintiff whole for all earnings, wages, bonuses, and other benefits that Plaintiff would have received but for the discriminatory and retaliatory practices of Defendant;

f.      Compensating and making Plaintiff whole for all other damages Plaintiff incurred as a result of the discriminatory and retaliatory practices of Defendant;

g.      Awarding Plaintiff all witness fees, court costs, and other litigation costs incurred in this Action, including reasonable attorneys' fees; and

h.      Awarding Plaintiff compensatory and punitive damages for Defendant's willful conduct and granting such other relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues in this action so triable, except for any issues relating to the amount of attorneys' fees and litigation costs to be awarded should Plaintiff prevail on any of his claims in this action.

CRAIG EDWARDS

By: __/s/ Peter S. Lubin_____
        One of his attorneys

Peter S. Lubin                                  Terrence Buehler
Patrick D. Austermuehle                          LAW OFFICES OF TERRENCE BUEHLER
LUBIN AUSTERMUEHLE, P.C.                          19 South La Salle Street, Suite 702
360 West Butterfield Rd, Suite 325               Chicago, IL. 60603
Elmhurst, IL 60126                               (312) 371-4385
(630) 333-0333                                   tbuehler@tbuehlerlaw.com
peter@l-a.law
patrick@l-a.law

16

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CRAIG EDWARDS, | 19-cv-03990 |
| Plaintiff, | |
| | Honorable John Z. Lee |
| v. | |
| AMAZON.COM SERVICES LLC, | |
| Defendant. | |

**<u>DECLARATION OF JASON CARTER</u>**

I, Jason Carter, depose and state under oath, that if called to testify in this case I would competently testify to the following based on first-hand knowledge:

1.      I am a Captain in the Army Reserves. I am currently employed by Convoy.com as the Director of Operations for the Atlanta office. I left Amazon due the events described herein because I felt I was being unfairly undermined as a manager by Jeff Messenger, the General Manager of the warehouse, who I believe, for the reasons discussed below and at my deposition in this case, mistreated me and Craig Edwards because we are African American.

2.      As I testified in detail at my deposition in this case, Craig Edwards and I were subjected to a campaign to undermine us by Messenger, and the case of Edwards to force him to quit Amazon through harassment and false attacks on his competence because we are African American. As set forth below, Messenger and other managers he enlisted forced Edwards out of Amazon because a white woman made false complaints to white men against Edwards. This resulted in a plot by Messenger to force Edwards out of Amazon by encouraging other managers to harass and mock Edwards and subject him to false criticism and ridicule in front of lower-level

Amazon employees who reported to Edwards. Messenger also made-up false reasons as to Edwards' supposed poor performance as a pretext to rate him an underperforming employee who he would no longer support for a promotion. This also appeared to me to be part of Messenger's express plan to run Edwards out of the building or Amazon.

3.     I started working for Amazon in 2012 as an Area Manager. After several years and several promotions, I was assigned to Amazon's new MDW 7 Fulfillment Facility in Monee, Illinois in mid-2017. At the time, MDW 7 was one of Amazon's cutting edge robotic warehouse facilities and was viewed as favorable assignment that presented an opportunity for promotions and moving to higher positions at Amazon. Before going to MDW 7, Edwards and I were trained in Amazon's Kenosha facility.

4.     At the end of our training, Messenger met with all the Senior Operations Managers ("OM 7s") that were headed to the new MDW 7 facility. At that meeting, which was attended by me, Augie Sundermeier, Chris Roe and Sage Greising, Messenger introduced himself. I was the only African American in the room and the only member of the armed services. At some point during the meeting, Messenger told a story that he obviously directed at me to put me in place showing that he was better than me because I had not attended a service academy and was African American so was not entitled to same respect as a Caucasian He recounted what he claimed happened at his graduation ceremony from the Naval Academy where he purported to have acted in a disrespectful manner to the President of the United States and his Commander in Chief. He stated that when President Obama handed him his diploma, he then supposedly said to the President: "I didn't vote for you. I voted for McCain."

5.     At MDW 7, I was an OM 7 with about 4 managers reporting directly to me and approximately 1000 employees reporting directly and indirectly to me. At this time, Craig Edwards

was a highly respected Operations Manager ("OM 6") who had already achieved top tier status at Amazon. I later rated Edwards top tier again and recommended him for promotion with the support of senior management at MDW 7. In fact, I asked to have Edwards working with me because of his superior performance. When I gave Edwards an assignment, I did not have to follow up or worry about it getting done. I knew he was going to exceed expectations and would work very well in mentoring and supervising the Area Managers ("AMs") to drive performance improvement.

6.     MDW 7 opened in August 2017. After it opened and after Edwards had successfully acted as a leader and supervisor in MDW 7 to turn around other shifts and problem area departments, I brought Edwards in to co-manage the Front Half Outbound Day shift ("FHD") with Laura Pratt in or about early February of 2018. Pratt was also an OM 6, but under her, the FHD shift was not working effectively. In fact, even though Pratt and Edwards were both OM 6's and technically were peers, I brought Edwards in to be a peer mentor to Pratt and lead her because Edwards was a Top Tier rated manager. Pratt was underperforming and needed coaching and mentorship from Edwards particularly in learning how to properly manage her assigned Area Managers who were unhappy with her leadership skills. This is a decision I made with Messenger, who at the time was the Assistant General Manager of the entire facility. I explained to Pratt many times that even though she and Edwards were both OM 6's, she had performance issues so he would be leading the shift and that this was a great opportunity for her to learn from him.

7.     This was not the first time I brought Edwards in to fix a problem or to trouble shoot. He was my top rated and top performing manager. Edwards had been rated "Top Tier" by Amazon at least twice by year end 2017. In Amazon's culture, Top Tier meant, at that time, that an employee was in the top 10% of all Amazon employees in his or her job level so it meant Edwards was in the top 10% of all OM6s.

3

8.      In or about early February 2018, Edwards went to work with Pratt in outbound FHD. Before the time he started, and while Pratt managed the shift alone, the shift was rated third out of four outbound shifts with Area Managers leaving or discussing leaving the shift due to poor leadership and morale. After 8 weeks on the FHD shift, Edwards's leadership had driven performance up about 29-32% and made it the first rated Outbound Shift. Edwards also inspired his direct reports, the AMs who directly managed the people who packed and loaded products for shipment. The AM's typically had 80-100 people working directly for them.

9.      Despite the much-improved performance of the shift and a turn around in AM morale, Pratt did not get along with Edwards, although she did not escalate any concerns to me other than one time; however I have now learned she escalated her concerns to Messenger and others, including Jason Murphy, the head of Human Resources for the facility, several times without giving me notice or an opportunity to hear them, determine if they were valid and address them appropriately. I cannot say whether she was jealous of Edwards or intimidated by him, or what exactly the problem was. Pratt's complaints (which were not made to me) are as recounted in an interview statement by her attached hereto as Exhibit 1 included:

A.  Edwards talked over her at meetings;

B.  Edwards did not understand the processes;

C.  Edwards lied to her;

D.  Edwards ran the shift "by the seat of his pants;"

E.  Edwards condescended to her;

F.  Edwards was dismissive of her ideas;

G.  The Area Managers felt beaten down and were unhappy.

4

10.     From my observation, all of these criticisms are false. Edwards's knowledge and understanding of the processes was both broad and deep. Because he had a "bias for action," he may have interrupted Pratt from time to time, but it was not done to embarrass or belittle her. It was, rather a call to action and consistent with my direction that Edwards act as a leader of the shift. The Area Managers were also very supportive of Edwards and some even asked to be reassigned from Pratt to Edwards.

11.     Jason Murphy was also critical of Edwards. For example, Murphy has stated in his Amazon interview, after Edwards made an ethics complaint that he was harassing him, that he told me that Edwards was chronically or normally late to synch meetings. This is false. Murphy never voiced this criticism of Edwards to me.

12.     Murphy was the head of HR for the MDW 7 facility at the time Edwards worked there. Without my knowledge, Pratt went to Messenger to complain about Edwards. After several complaints by Pratt, Messenger instructed Murphy to observe Edwards and he did so by attending the early morning "sync" meetings that Pratt and Edwards held every morning with their AMs prior to starting the shift. I also typically attend sync meetings by phone. I was on the phone for both the March 26 and March 27 meetings described below.

13.     While attending the sync meeting on March 26, 2018, Murphy interrupted Edwards while Edwards was addressing his AM's and describing a contest designed to give the AMs a chance to compete for a free lunch. Murphy interrupted and squashed the idea. It was unusual for Murphy to attend sync meetings. For example, he never went to the night shift outbound sync meetings. It was more unusual for Murphy to interrupt and criticize a manager in front of his direct reports. It was even more unusual for a non-operations person to interfere with operations as

5

Murphy did. Since there was no immediate situation to correct, the correct course of action would have been to pull Edwards aside and speak privately about the matter.

14.     Murphy also attended the sync meeting on March 27, 2018. At the March 27th meeting, Edwards was in the middle of explaining how he and Pratt were dividing their duties and told his AMs he would send them a more detailed explanation by email. Murphy interrupted and told Edwards not to send an email but to go over a memo with the AMs at their next morning meeting.

15.     Murphy's above-described interactions with Edwards, in my opinion as someone who witnessed them, were inappropriate and undermined Edwards in front of his Area Managers. Any legitimate criticism which Murphy had of Edwards should have been handled privately.

16.     Murphy later reported that Pratt thanked him after the March 27 meeting for interrupting, criticizing and undermining Edwards in front of their AM's. Murphy also reported the following from the meeting as recounted in a statement drafted by Murphy attached hereto as Exhibit 2:

A.     "Craig came in late as he normally does."

B.     Murphy chose to interrupt Edwards because: "I could tell right away, Craig was making this up as he went along. There was ZERO thought put not whatever idea he had at the moment."

C.      Murphy also alleged: "Daily he comes up with unachievable TPH goals and the AMs just laugh at him."

D.     And: "To me this was just another example of his poor planning and failure at execution."

6

Murphy commented, as set forth in <u>Exhibit 2</u>, that the AMs (who greatly respected Edwards) were laughing at him, not with him. Murphy also claimed that the AMs were rolling their eyes at the unreachable goals that Edwards set for the shift. In fact, these goals were the benchmark standards for our regional buildings and the other buildings were meeting these goals. He also mimicked Edwards in this statement using purported quotes of what Edwards said to make it inaccurately seem as if Edwards was incoherent and stammered or had some sort of trouble getting his words out.

17.     Murphy was out of line based on my listening to the meeting via the telephone. With rare exceptions, he was only attending the Edwards/Pratt sync meetings, not those of other shifts. He was there to observe Edwards only. His claims that Edwards was unprepared, that Edwards was chronically late and unprepared, and was openly treated with disrespect by the Area Managers are all false. Edwards was never written up criticized for being late or unprepared. He was consistently rated a "top tier" performer by me and other senior managers at Amazon and still should have been a candidate for promotion in my opinion.

18.     Pratt only complained about Edwards to me one time. She complained that Edwards was taking over the shift and was not listening to her or her ideas. I informed Pratt that she should listen to Edwards. I put him on the shift to drive performance and she should learn from him. Pratt then made her complaints to Messenger (without my knowledge). It appears that after Pratt made these complaints about Edwards to Messenger, Messenger directed Murphy to keep an eye on Edwards. Pratt, according to <u>Exhibit 3</u> attached hereto, complained to Messenger that Edwards was dismissive of her and her views.

19.     After Murphy reported back to Messenger, as described above, Messenger decided to force Edwards to quit through a campaign of harassment by him and other senior managers who

7

acted on his direction. On or about March 26, 2018, he called me and Edwards into a meeting without Pratt. He sent us down a rabbit hole of false claims about Edwards having performance and leadership issues regarding his management of AMs. He falsely accused Edwards of causing disarray on the shift and among the AMs, even though Edwards had restored morale to the FHD shift and was greatly respected by me and the AMs. Messenger became visibly angry when Edwards pushed back on this false narrative but did not tell us what I later learned: that the meeting was the result of Pratt's escalations to Messenger, Murphy and others and Murphy's false statements that Edwards was mishandling meetings with AMs who were supposedly mocking and laughing at him.

20. Following the March 26th meeting, in a meeting with me a few days prior to April 15, 2018, Messenger informed me that he was sick and tired of the situation with Edwards and Pratt. He was moving Edwards and Pratt to the night shift because they were both in protected classes, meaning Edwards was African American and Pratt was a woman. When I told Messenger that the night shift created a hardship for Edwards due to his wife having to travel out of state to care for her elderly mother and if he had to work the night shift it would cause him to quit or leave the building, Messenger replied, "No Ops Manager is going to tell me what to do".

21. Messenger made this decision even though this was the type of hardship that allowed for not having to work on a particular shift. With Messenger's approval, I made these types of shift accommodations when similarly situated non-African Americans had made comparable hardship requests. In other situations, for other employees, including Sanjay Gupta and Matthew Bryant, who were not African American, Messenger made the decision to accommodate their hardship request after being informed of their request by me. It was Messenger's decision and neither he nor I had to inform HR or get it documented by HR in these other instances where

8

Messenger, when asked to do so by me, accommodated the hardship requests of these two non-African American managers.

22.     In a meeting with senior managers days prior to April 15, 2018, where Messenger announced the transfer of Edwards and Pratt to the nightshift, Messenger made it clear he wanted Edwards gone. Mark Dague was the new OM 7 assigned to manage Edwards on the night shift. Messenger said: "I am going to turn him over to Dague because Mark knows how to manage him." Dague then immediately responded, "Oh yeah. I'll manage him out." Others at the meeting laughed and encouraged this response, and Dague was not reprimanded or told by Messenger this was inappropriate and that he should not engage in this conduct. I understood Dague to mean that he would make Edwards' job situation so miserable that Edwards would quit as I have heard the term "manage out" on other occasions at Amazon. I brought up this comment to Messenger in a later meeting that included Murphy, Messenger and other senior managers including Wesley Chrisos. Messenger did not deny that he had encouraged Dague to manage Craig out of the building.

23.     At my time at Amazon, I have never seen a plot to manage or harass a white or non-African American manager out of a building or out of Amazon. Amazon has set procedures for firing managers for performance issues which require due process, setting up performance goals and then only terminating them after an extended review process with HR involved and clear-cut failures to meet the performance goals. Edwards was treated differently than any white or non-African American manager that had alleged performance issues. Those employees were notified of the issues in a truthful and accurate manner and given a chance to improve and were not subjected to a plan to manage them out of Amazon through harassment and attempts to demean them in front of their AMs as Edwards suffered.

24.     After Edwards filed an ethics complaint, Messenger was interviewed by Kate Line, the investigator. In that interview attached hereto as <u>Exhibit 4</u>, Messenger made the following representations about Edwards since joining the FHD shift: "Attrition with managers leaving and an observed disconnect between Ops and AMs;" "Laura [Pratt] seemed very defeatist.;" "sync meetings Laura would play second fiddle"; "Craig would dismiss her comments, speak over her;" "Craig being dismissive of her comments;" "Craig indicated he had school age kids and so couldn't move to nights."

25.     Each of these statements is either false or misleading. In fact, attrition dropped when Edwards took over the shift. And, since Messenger and I had told Edwards to take over the shift and lead Pratt, she was the second fiddle. And Edwards did not refuse the move to nights because he had school age kids, it was because his wife was caring for her mother out of state and if Edwards had worked nights, he would be sleeping during the day and no parent would be available to help the kids.

26.     In that same witness interview, Messenger falsely denied that he said that: "Ops managers [are] not directing to me what shift they will be assigned."

27.     In a later email dated September 26, 2018 to Jessica Smaagaard (<u>Exhibit 3</u>), a regional HR manager, Messenger falsely stated:

A.      "Their [Pratt and Edwards] shift had the highest productivity of the four core shifts, but my feeling was that this was in spite of tumultuous leadership at the Ops position (Craig and Laura)." In fact, it was clear to me that the shift was performing better than all the other shifts because of Edwards' leadership and that AM morale had drastically improved due to Edwards's mentoring and leadership skills which were consistent with his Top Tier rating. Productivity had improved about 29-32% in the few weeks that Edwards ran it Moreover, Messenger's criticism of

10

Edwards ignored all the metrics. His shift was the highest performing core shift as measured by its productivity. Messenger's statements to me that Edwards' shift's performance was sliding, and that Edwards's AMs were complaining about him were false.

B.    "I also felt that Craig's need to continue developing his process knowledge would be better managed with Mark Dague on the night shift…" This was false because Edwards' knowledge of process was substantial, and in certain areas, exceeded Dague's knowledge. It was nothing more than an excuse to put Edwards on a shift that Messenger knew Edwards could not work on and would force him to quit or transfer out of the building.

C.    "I was not aware Craig requested a hardship to Jason Carter when he was informed of his new shift." This statement is false. I told Messenger that Edwards requested a hardship accommodation before Messenger assigned Edwards to the night shift and Messenger made clear that he did not care about the reasons for Edwards hardship request when he stated, "No Ops Manager is going to tell me what to do".

28.    Messenger and Murphy informed me that Edwards was no longer considered by them to be a candidate for promotion and that they would not support him for promotion. I have never seen a GM demote a white or non-African American OM 6 from top tier and eligible for a promotion to "struggling employee" in a matter of a few weeks without written communications and extensive communications regarding the matter which provide a fair process for the OM 6. The way this was handled is contrary to Amazon's generally accepted policies or practices for removing a person from eligibility for promotion recommendation.

29.    At the time of the transfer in or about April 15, 2018, I told Edwards that he should leave Amazon or MDW 7 because he was being ostracized by Messenger. I did not tell Edwards about the explicit plot to manage him out of Amazon or MDW 7 until I left Amazon. When I was

still at Amazon, I was concerned for my own job security and did not share that information with Edwards then for that reason.

30.     Pratt and Edwards were not the only OM 6 peer managers who had trouble getting along at MDW 7. Helen Qualch and John Chiuments were OM 6s working together. They also had trouble getting along. Neither was African American. They continued working together and ultimately one was promoted to a position that provided a higher salary. We had other senior managers who conflicted on how to run their shift and they were not disciplined or separated: Sage Greising and Nicole. Neither was African American. Amazon and Messenger treated Edwards and Pratt's situation differently from the situation in which the conflict was not between a white woman manager and an African American manager.

31.     The criticism by Messenger and Murphy that Edwards performance was marred by his communication skills was not credible as Edwards ability to mentor and direct his AMs was a driving factor in the greatly improved shift productivity. For example, Rachit Sachdeva, a white man, was a terrible communicator. But he performed and as a result, he was promoted. I have never seen a white employee downgraded or demoted for perceived poor communication skills.

32.     When Edwards asked to come back to MDW 7, he informed me that he was told that there were no OM 6 positions open. That statement is false. While Edwards was out on a personal leave of absence, Amazon, per standard practice, included him in the headcount for MDW 7. It is the policy at Amazon not to fill a position when an employee is on leave of absence and still listed in the head count and part of the employee budget for the building. And the position that Edwards had been reassigned to, BHN, had not been filled. Moreover, there were enough OM 6 positions at MDW 7 that even if his position had been filled, Amazon could have found another OM 6 position at MDW 7 for him.

33. When Messenger first informed me that there was a problem with Edwards's leadership and that it was affecting his performance, at the March 26, 2018 meeting with Edwards., Messenger falsely told us that the complaints were coming from Edwards' Area Managers. This sent me down a "rabbit hole" trying to understand the source and the substance of the complaints. I did not find out that Pratt was the source of the complaints against Edwards until Pratt herself told me in the conversation we had when I informed her that she and Edwards were being moved to the night shift.

34. Messenger's statement that he had to keep Pratt's criticisms of Edwards confidential is not only false, but also completely contrary to Amazon's policy of complete transparency. In Amazon's culture, I had a right to know who his accuser was and what he was being accused of so that I could create an action plan to correct the situation. Amazon allows lower level employees and managers to regular review the performance of senior managers above them.

35. Any statement by Messenger or Amazon that Edwards' AMs could not be interviewed because of concerns that it would undermine the team is false for the same reason.

36. While at Amazon, I never experienced my General Manager or Assistant General Manager or any senior manager above me step in and overrule me on shift assignments or reassign any of my white or non-African managers without my supporting input and approval. I never experienced my General Manager, Assistant Manager, or any senior manager above step in and remove a Caucasian or non-African American manager from the promotion pool in direct contradiction of my position on the issue, without telling me or without providing any written documentation for this significant demotion in employment status.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct to the best of my knowledge.

Dated: _19 FEB 21_

Jason Carter

# EXHIBIT 1

Laura Pratt

Monday, April 23, 2018

9:15 PM

Talk to me about what you've seen between Jason Murphy and Craig.

Most memorable of the interactions between Jason Murphy and Craig Edwards. Jason had
started to become a presence in our sync meetings over the course of a month. We were
having issues with AM retention, concerns like work life balance, being overworked etc.
So I assume this is why Jason was involved more and more. Jason has been very vocal to
question operations in a constructive way. Asking question about why did we struggle
with fast start why are rebinners standing around.

The most memorable was Craig came in and wanted to do a contest. She was aware that
AMs had reported to HR that there was a lot of change going on. On this day Craig
stated at the end of the sync that they should do a quick contest for 7 associates -
every AM throws in money and the winning AM gets the pot. Jason interrupted and said
"no" you need to have a plan with something concrete. I was actually thankful Jason
did it because Craig was always doing this sot of thing in the name of bias for action.
He did this publicly in front of the AMs. I ended up thanking Jason for doing this. I
was trying to avoid the visible disagreement with Craig in front the team.

I never saw anything inappropriate. I've always seen Jason as a senior team member and
his points have been valid. I believe Jason would have called me out in similar
circumstances. Never viewed him in a negative way.

Any feedback from anyone else?

I think the AMs are actually puzzled by Jason Murphy's role in the syncs. I even saw
AMs texting with each other asking about why Jason was texting in the sync.

Shift changes

I was informed on Sunday a week ago by Jason Carter. He told me that based on the fact
that Craig and I can't get on the same page and the concern to not let this shift go
stagnant and to further my understanding of the operations I would move to CAP. I was
also told Craig would move to RT in OB since he didn't have enough OB experience.

I didn't want to move because I'm very connected to my team. PAs even told me I was
the only stable thing they had. But I can honestly say I was at a crossroads to figure
out how to work with craig. He is not receptive to feedback and there were a lot of
instances where we were even at odds with each other. I had talked to Jason Carter
about the fact that a third party (Jason Carter) would need to be involved to

I also had a conversation with jeff messenger when he saw that I was visibly upset one
day. I told Jeff I was really struggling; Jeff said it was obvious craig and I were
not on the same page. He went on to say the leadership team had been tracking this for
some time and they were likely going to make some changes. Jeff told her I don't think
there's anything immediate but we are tracking to make an adjustment. What did you
take this to mean? I took it to mean one or both of us would be moving shifts. This
was a fair move in my opinion since we couldn't work together as a team. They didn't
assign blame they said we need to make a change.

I was shocked it happened as quickly as it did - the conversation with Jeff was Tuesday
and we were moved Sunday.

Jason asked me how soon we could make the transition - I said I wish I had a valid
reason to say I couldn't do it immediately so I made the transition this week.

Did you tell Craig you had raised concerns to Jeff and anyone else?

The day I went and thanked jason murphy for his sync intervention I told jason I had
had issues to the point where I was taking notes on interactions with Craig with dates
and times to ensure I wasn't just making this up - that it was a lot. A few hours
later Craig was called down to the HR office - he confronted her and said "I just got

her into a conference room and said "what did you say to them" "how did they know about X" X was a call I had from Craig at 930 at night when I was in tennessee to tell me one of my AMs was going to BHD for 5 weeks. This was a new plan and didn't make sense to me. He said "look a decision had to be made and it's one." I talked about the impact to the associates, her connections, the fact we'd lose her AFE1 experience. I told him I didn't agree with this and we should have discussed this. Next day I talked to Jason Carter and he said it didn't have to be this particular AM - she suggested the new AM should go to BHD for that period of time. Jason told her he totally agreed with her. I told Craig that I talked to both Jason and the AM - He went on to say "did you talk to Jeff" I told him no that I had only talked to Jason Murphy "what did you say to him" She told him she shared with Jason the issues the two of them had been having with their communication.

Most recently I spoke with him on the phone the week before last and told him we needed to get on the same page and may need to sit down with Jason Carter. He approached me again to say "what's going on here who did you talk to what did you say" I explained what I shared with Jeff. Craig said he wasn't going to stand for this because they were the only shift that was showing any improvement. Craig asked for the email she referenced to sending to Jeff about her concerns. She refused to because she didn't want to start in on that. She did not send him the email. Craig was very upset and talking about how this was impacting his family. He told me his wife couldnâ€™t be alone at nights - they live in a train-track neighborhood which is too close to the bad part of the tracks. If I leave I'll be leaving 300K but they are putting me in a bad position.

I knew he had worked nights since starting at the building so this new information seemed odd.

Craig insinuated that it was my fault that he didn't have the leverage he needed to make a complaint. I read the email to him verbatim and I will read it to you verbatim.

"Jeff - thank you for your time; open and honest convo; I talked to jason to see if the three of us can get craig and I on the same page. Not putting all on craig. I'll let you know how it goes. I owe it to my team to make this partnership work. Talented ams don't want issues for their success. If you have other suggestions let me know."

No response from jeff.

What else would you like me to know?

When I came back from time in TN he was adamant he wanted to run flow. He wanted me to focus on the administrative and the associate engagements. This was march 26th. Running flow you own shift planning, making adjustments to staffing. I made notes of this because craig, from the time he started on OB Days team he discounted flow. He said a tier 3 could run flow and didn't think it was important. I was telling him how important it was to understand flow. Told her she needed to be in a 6 to prep him for flow. He called her that morning and didn't get in in time to review the plan. She did the review and update since he wasn't ready. 9am sends a note that we would start waterspidering during breaks - so at 11:15 we needed to have people identified and change their breaks to achieve this. He said if anyone goes over plan they'd have to pay it back (make due with less labor) - dock had a bad hand off that day so they couldnâ€™t achieve their plan. This is unrealistic to expect the dock to do this - he clearly didn't understand the risk this would put the dock under. At 230 he said he had a meeting with ashley in HR and wouldn't have it ready for P3. The AM supporting flow sent a plan out at 430 or 5pm that day. I reminded Craig that the Ops are supposed to do the pre shift plan so I asked why an AM sent it out. He said "I didn't tell him to do that, did you tell him to do that?" I told him I assume the AM did it showing ownership and to help the AMs on the next shift plan their labor. Next day Craig was late again and the AM was there again making the plan for the day again. When she approached him to ask why he was doing the plan he said Craig had told him to do it. This was verified on an email. Craig didn't show up for work

That's just one specific example of him not understanding the processes, lying in his communication to me, and running the shift by the "Seat of his pants."

accountable - she had just had a conversation about standards for the hand off that morning and told Craig and the team about that conversation and he said "looks like that really worked" - condescending her.

Mimicked her in front of the PA and one of the AMs - because I was present I saw this.

Ashley had a discussion with Craig once where he completely dismissed her.  Craig told me that Ashley coached him on it.

Another example was putting posters up about prizes for a contest to run on days but he hadn't thought through about other shifts including how it could work with RT shift. He claimed it was Bias for Action.  He then mimicked her voice to say "Laura hates when I say bias for action"

He is very sour about not getting senior ops position.  Doesn't respect the decision that was made of the L7s that were selected in Q1.

Talked about Mark Dade not having the top team but he was promoted to Sr Ops; talked that Jason Murphy doesn't know the real amazon and Mike Stone would have high fived him for the bias for action he showed in that meeting.

His not getting selected and then put into this role seems to have jaded him in the role from the start.

I donâ€™t want craig to be in a bad situation but I would be extremely frustrated and it would be inequitable if he got to stay on that shift. By shift she meant that team specifically.

Clarify bad situation.

I'm not vindictive; I don't wish ill on people but I feel guilt for the four kids.  But I feel like he's overly dramatic about this.

Shift preferences -

I've only seen it with an AM - the AM, female, was on RT shift and from my understanding (this is from her side of it) she said she could not physically work on the shift because she was away from home and didn't have a support system that aligned with the days she had off.  She told HR she had been seeing a therapist for the depression from it.  She had been in the hospital for digestion issues.  She asked HR how she could quit.  My understanding is they worked with her and her doctor to get a shift change to BHD.  She shared these details with me directly.

Any last comments/questions?

Would like to know when this is complete.  Asked lots of questions if she'd ever hear about the complaint.  I shared she probably would not but that because of her involvement in the case I would encourage Jessica or whomever to let her know when the actions were complete.

# EXHIBIT 2

I attend the OB operations sync every day at 6:45AM. After that, I rotate between AFE1 and AFE2 stand up every day at 7:30AM. When there are no safety incidents from the previous day, I attend the 8:30AM OB sync to discuss the first pure hour. Needless to say, I have adopted OB, mainly the AFEs. Over the past several months my daily observations have been how poor our fast starts are. Just about every day, I am the one calling out conveyors that are not running, various jams, low WHIP or even no work at all. I have shared this information with Jason Carter, Sr. Ops Manager for the department and Jeff Messenger, GM. I regularly call out to the AMs on Wednesdays (cross over day) to challenge themselves and not let their HR Manager find barriers to a good fast start. Towards the end of February/beginning of March, Kevin Kirves stopped by to chat with me about how poor our fast starts were. I called out some things that HR was doing to help in this space, by letting AAs know when they arrived late for standup, HR being more visible at standups, and on the floor in general. Kevin seemed very frustrated on how slow MDW7 was coming along. I told him I would continue to push for fast starts and insert myself where possible. Jeff Messenger have daily conversations on the not so great start ups for OB. Several months back Jeff asked me to be more direct in my engagements and call things out that I see vs. just reporting back to him. He asked that I focus my efforts on AFE alone. Since then, I have had to go to the ship dock and get the AM involved when the tote stacker is down…thus causing down stacking of empty totes in the AFEs. I routinely get with the AMs and OMs when the inductors/rebinners are out of work and are just standing around. I jump in and induct when there isn't much work in the system at the start of the shift. I communicate back to the AMs reminding them that little or no work for the inductors/rebinners is not only hurting their individual rates, but it also causes a lot of TOT hits, that the AMs then have to STU for.

During my time observing OB Ops Sync, I have noticed how much Craig Edwards and Laura Pratt are running a completely different style shift than Chenille Boswell and John Jalocha. Chenille and John are always on the same page with their messaging and goals for the day. They work together and actually complement each other's styles. Craig and Laura are the opposite. Rarely do you see them working together. They alternate days on who is "leading" the shift for the day. There are times where one has no idea what the other one is talking about when it comes to the plan. Often when Craig is leading the shift, the plan feels very much patched together and the AMs have to correct many of the things he is referring to. His only direction is around TPH. Daily he comes up with unachievable TPH goals and the AMs just laugh at him. Often he looks at TPH and then tries to build the plan backwards. However, he appears to not understand how some elements of the plan impact others…..WHIP for example.

One particular day, Laura was leading the meeting. Craig came in late, as he normally does. Sat in the corner and contributed nothing during the discussion. Laura finished and just as she was about to break asked Craig if he had anything. He looked up towards the ceiling as if he had an idea and said, "yes!" He stands up and says "seven is a great number, it is the perfect number". "So, um……let's take our…..um……seven best performers…..and um……" I could tell right away, Craig was making this up as he went along. There was ZERO thought put into whatever idea he had at the moment. The AMs were laughing and in my opinion, they were laughing at him. He continued with "so yeah….let's take our best seven performers for each AM and have a competition." "Oh….um……we can have the losers buy the winner lunch." "oh wait, um….let's have each AM put in $2 and the winner takes all……so they get lunch on the others." At this point I interjected and said Craig, I appreciate the desire to have a competition, but honestly we need to be focused on our fast start. I indicated that I had a call with Kevin Kirves later in the day and didn't want to bridge a bad start to the shift. I believe Laura chimed in and said "okay guys let's focus on fast start and get out there." I could tell that Craig felt a little deflated with my opposition of his idea. I asked Laura after the meeting if she had a second. I was like, I hope Craig wasn't offended. Laura stated that she was so glad I interrupted him. She said that he does stuff like

that all the time and she has no idea about it. She said it was very frustrating to work with him. Later that morning I talked to Jason Carter, who is normally on the call and I cannot remember if he was this day or not, and he agreed that it was a half-baked idea and that is how Craig was….always unprepared. I am not sure how much time had passed but something similar happened in the following days.


Craig was running shift surprisingly stated, based on Laura's expression, with "Okay guys. Laura and I are working on this new way of running shift, I don't have all the details on it so I will email you. Let me tell you about some of the things." He went to open up his laptop, which wouldn't turn on. He then turned to Laura and asked her….. "do you remember any of the things we talked about." Laura, in a stunned response shared a few of the topics/measurables. Craig then looks around for something to write on, which he didn't have anything. He then borrowed a pen from an AM and started to write on his hand. To me, this was another example of his poor planning and failure at execution. The AMs all looked confused as he could not remember any of the points that he and Laura were discussing. I interjected and said, "Craig, why don't you come back tomorrow when you have this all planned out and printed for the AMs to review." Craig said "I told them at the beginning that I would email it." My response was that the AMs get enough email. Print it out and talk about it tomorrow when you can have more dialogue around it. I again could tell that he didn't like me sharing my feedback. After the sync meeting I met up with Laura and she said something to the effect that here we go again. She indicated that Craig and she were supposed to get together at 6:00AM to begin discussions on how they wanted to run shift. She said that he was 30 minutes late and they had only discussed a few items. She said there was no plan to share anything with the team, but he did so anyhow and caught her off guard. I told her I would get with Jason Carter and discuss it with him. By the time I connected with Jason Cater, he informed me Craig had already said something to him. I let Jason know about my conversation with Laura and how she was completely caught off guard. She says that Craig always makes promises about the two of them meeting to discuss the plan, the shift, etc. and he never shows up. Jason said Craig thought I was inappropriate for interrupting him and that he felt it needed to be escalated. According to Jason, he told Craig that he needs to come and discuss it with me. Needless to say, Craig never did. Since these two events, OB has ran a couple of half-baked competitions. One of them was called Clash of the Titans. It was announced by Craig to the AMs and they rolled it out to their teams. However, because there wasn't a good way to report out on the status…..it hasn't really went anywhere. We have since seen VOA comments by AFE AAs saying they won one of the days but never received their award. Two weeks ago in the Ops Sync, Craig was indicating that he had the metrics team working on a tool to communicate the status of the competition. He instructed the AMs to just tell the AAs that it is still going on and we will share with them shortly the results. He then turned to Thom Harvey to talk about a "new" competition he wanted to get started. One of the AMs said softly….so much for Clash of the Titans. This time around, I stayed silent in the room, but shared with Jason Carter and Jeff Messenger.


At no time during any of my conversations in any of the Ops Syncs had I ever raised my voice, used profanity, or made any statements that could be considered embarrassing. On the two occasions that Craig has referenced, I felt that the information/idea being shared was so poorly planned and executed, that as a Sr. leader in the building, it would have been even more harmful to not have said something.

# EXHIBIT 3

**From:** Janine Blatt [janine@jjdlaw.com]
**Sent:** 9/27/2018 9:29:40 AM
**To:** Smaagaard, Jessica [acissej@amazon.com]
**CC:** Howard, Lauren [howarlau@amazon.com]; Stevens, Mike [misteven@amazon.com]
**Subject:** Re: Craig Edwards performance and feedback

# Redacted

On Sep 27, 2018, at 6:56 AM, Smaagaard, Jessica <acissej@amazon.com> wrote:

# Redacted

**From:** Messenger, Jeff
**Sent:** Wednesday, September 26, 2018 1:29 PM
**To:** Smaagaard, Jessica <acissej@amazon.com>
**Subject:** Re: Craig Edwards performance and feedback

Hi Jess,

Craig Edwards was sent in Q1, his second try, for an L7 pod. Prior to that he received feedback on how to be successful from multiple leaders including myself, Jason Murphy, Mike Stone, and others. He was not successful at the pod, in part due to his communication style being too verbose and not focusing on the growth that occurred since his first interview for L7. After that pod he received his feedback, and I worked with him to schedule calls with his interviewers to receive even more detailed feedback. We were intent on helping him to improve to be successful on the next pod we felt he could be ready to try again. Prior to that pod in Q1, he was placed in roles to manage operations projects based on his aptitude to deliver results. Based on the feedback from the pod, we felt his biggest opportunity was to earn trust through direct communication and talent development, so the senior leadership team decided to place him in a role where he would run a shift, which ended up being Front Half Days in Outbound alongside a peer, Laura Pratt. His senior ops manager would soon be Jason Carter, who we also felt was a high performing, high potential leader as well as a candidate for AGM. I had conversations with Kevin Kirves about leaving the AGM position vacant until Jason gained Outbound experience enough to fill our opening at AGM later in the year. Both Craig and Jason we felt could reach the next level with the right opportunities and feedback.

Craig joined the OB Ops team and had a learning curve to work through as he had not been in this role previously, or at least not for a long time to my recollection. Jason also had a learning curve as he had not be in an AR OB Sr Ops role previously. Laura was experienced in this role since launch, and on this shift. The team was doing well and had the highest overall productivity, but as a building our OB operation was below its peers in terms of productivity and quality. As was our plan, the senior team focused heavily on OB throughout the year and provided all OB Ops with a lot of feedback on how to improve. I felt Craig's area of opportunity eventually became to dive deeper into the process. I

recall hearing that Craig was approaching his assignment "like a project" and wasn't fully invested for the long haul. I heard comments from people like Laura Pratt that he routinely referenced his dissatisfaction with being not inclined at the L7 pod, which could have negatively affected the team. I regularly met with Ops managers in a skip-level format to dive deeper into their process and look for opportunities to improve. I was not able to get a level of detail necessary from Jason during morning 9am (daily deep dive) meetings, and I presumed this was due to Jason being early in his learning curve. Over time this was not developing quickly enough, so I began scheduling a recurring meeting with Jason and both of his ops on shift, Craig and Laura. I set expectations for certain metrics to be addressed, and in some cases we had to get started without all parties in attendance because they were preoccupied, and we couldn't wait for the person to be tracked down from the office. In several of these meetings the clearly outlined metrics were not fully explained, and per normal deep diving I challenged the level of understanding from the senior and the ops. This feedback was professional and direct to address opportunities in performance. At some points the team was prepared and had answers to my questions, and at other points there was room for improvement. I still felt the necessary deep dive skills could be improved, but received pushback on my feedback that the expectations were unclear and the feedback was not well received by Craig. I recall one point where Jason coached Craig on the spot to stop disagreeing and simply try to hear the feedback and try to find some truth in it, to paraphrase.

I received several escalations from Laura that her partnership with Craig was not working well. She claimed that Craig was dismissing some of her direction, or talking over her in meetings to make sure his voice was heard over others. She also claimed that AMs were being promised promotions if they could complete certain projects, which she felt was a slight against her relationship with her previous direct reports that now reported to Craig; this claim I do not feel is very strong against Craig, but to me it spoke to a poor working relationship, communication, and misalignment. She was emotional and frustrated to the point that I was convinced we couldn't continue to allow the two of them to work together. Their shift at that time had the highest productivity of the four core shifts (FHD, BHD, FHN, RT), but my feeling was that this was in spite of tumultuous leadership at the Ops position (Craig and Laura). I spoke with Jason Carter, Jason Murphy, and other senior ops of my decision to move them both onto teams and shifts that would not interact frequently to ensure there were minimal opportunities for personalities to clash as a result of the move from a heavily preferred shift (FHD). I felt it was the most fair to move both and not show preference to either. Frankly, Laura is female and Craig is African Americas; both are currently, unfortunately minorities in operations leadership. I believed there was risk in moving either instead of both. I wanted to keep Craig in OB so he was moved to the RT shift, and Laura was moved to the CAP team on FHN; the two shifts do not overlap on Wednesday. I also felt that Craig's need to continue developing his process knowledge would be better managed with Mark Dague on night shift as Mark had previously been an L6 Ops manager in OB at MKE1 and MDW7. I felt that Jason needed to improve his process knowledge, and he would rely heavily on knowledgeable L6 Ops managers for that knowledge. This change in assignments would allow for Tom Smotrich to run the FHD OB team, which would allow Jason to benefit from Tom's extensive knowledge of AFE. I saw these moves as a win-win to resolve the conflict I perceived on FHD, and set Jason up for more success to learn from a more knowledgeable operator, and also to develop Craig to gain process knowledge more quickly.

I was also told by Jason Murphy that in several pre-shift meetings, Craig would display similar behavior to what Laura described as being poorly thought out. I was told Craig would share ideas or initiatives on how to reach higher productivity targets, but seemed to be improvising the idea. The impact of these improvised directions I believed would be lack of buy in, and lowering the credibility of the Ops. In conjunction with my own observations of Craig's communication style being, in my opinion, unnecessarily verbose, I believe he was focusing on high level inspirational leadership and not enough on detail-driven process knowledge. I eventually shared with Craig in a feedback session where he challenged my notion that I was receiving escalations on his leadership style. He wanted to know which AMs I had surveyed and invited me to go speak with area managers to validate his assumption that he was well liked. I told him I was not interested in surveying his team. I felt that if I pointedly asked his team about these behaviors I had heard, it could further damage his credibility or reputation, or potentially be not relevant/credible answers as he was their direct supervisor. I also felt that this would not be a valuable use of time as the AMs were not the escalation to which I was referring. I believe that Craig felt I had fabricated the fact that I received escalations as he perceived my statement to be coming from Area Managers, when I was actually referencing Jason Murphy and Laura Pratt.

I gave the direction to move Craig and Laura to Jason Carter professionally, and also sent an email to the senior team that I do not prefer to unilaterally make assignment changes for L6 managers, but if I do then the L7 team must own the direction in the sense of "Have Backbone, Disagree and Commit". Following the ethics investigation results it came to light that my direction was communicated to Craig as "Jeff's decision" and that I would not be swayed by hardships or other pleas. I believe this is largely influencing Craig's feeling of being targeted by me, although I was not aware Craig requested a hardship to Jason Carter when he was informed of his new shift, only that he had a preference for dayshift prior to the decision being made.

Craig referenced repeatedly that he could deliver results, and I responded by positing that "Deliver Results" was not the only leadership principle required to be successful as a level 7 Senior Ops. Craig would need to develop his ability to dive deep and communicate more effectively. Based on his sincere reluctance to hear that feedback, I and Jason Murphy shared with Jason Carter that would not support him to return to another pod without improvement.

Please let me know if any more information or detail would be helpful.

Thanks
Jeff

# EXHIBIT 4

Jeff Messenger

Monday, April 23, 2018

11:00 AM

Wasn't copied on the ethics complaint

Can you tell me about the way your building makes decisions to move managers?

Thursdays sr team meeting; excel sheet that Jeff maintains - tracks risks for transfers etc. Risky areas we try to make sure we don't place new hires there.

BHN ops mgr identified as a risk to transfer to MDW9. 4 weeks ago they communicated they were going to get an offer soon. John Shoemental. Rt is lowest performing shift. Grant White was on FHD and was movedt o RT as he was perceived to be one of the highest performing to improve this shift.

Technical strong leader in OB Ops role is Mark White.

How was it decided to move Craig and Laura?

Decision to move Craig was to move both him and Laura off FHD due to engagement problem. Attrition with managers leaving and an observed disconnect between Ops and AMs. Laura seemed very defeatist. She would say things like "teams are beat down." She was also clearly not jiving with Craig Edwards. Sync meetings Laura would play second fiddle to Craig - Craig would dismiss her comments, speak over her. She'd be visibly upset after meetings with him. Emails about separating duties where she would get all the admin portion. They had no chemistry working together. As compared to the duo on BHD who work well together.

Tell me more about Laura's concerns.

Laura raised issues to Jeff directly about the issue - 2 weeks ago she came to Jeff and had clear feedback around Craig being dismissive of her comments and a strategy of developing AMs that she didnâ€™t agree with. Craig would say "you own this project and this is how you get promoted" referring to promotions a lot. Her AMs felt that she, in comparison, wasn't promotion focused enough.

What sorts of feedback have you shared with Craig given these concerns you've had?

Direct with Craig about his communication style. Over delegating etc. Started in January with mock interviews.

Who delivered the communication about the shift change to Craig?

Jason Carter communicated the BHN move to Craig directly about 2 weeks ago. Goal to have it start in at least 2 weeks.

Email back from Jason - I was told Craig asked for it writing so he could refuse it. Craig indicated that he has school age kids and so couldn't move to nights.

Any other examples where people have denied shift changes?

We've had folks who communicated it proactively based on medical issues with family members or medical accommodation themselves but all this was proactive.

What do you believe was the primary driver for the shift change?

Problems on the shift and the need to separate the two Laura and Craig based on their impact on the shift.

What conversations have you had with Craig since he refused the shift?

No conversation with craig after he refused the shift; no specific conversation with Jason after refusing the shift.

No communication that he recalls about telling someone to look for another building if they couldn't take this shift.

Email Jeff sent last Monday even after the conversation with Jason. (Jeff sent this to me)

assigned.

What sort of interactions do you typically have with Craig?

Regular interaction with Craig.  Once or twice a day - CE and quality issues.

What was Laura's response to be moved to FHN?

She spoke to me last weds or tues and thanked me for hearing her out - felt like she got a fair shake.

Anything you want to share?

Motivation for moving them:  (context for the email he sent).  Issues with Craig and Laura's interaction with the AMs.  1.  Both are underrepresented minorities - didn't feel comfortable only moving 1 and didn't want to give the impression that there would be a move for the person the other one complained about.  2.  FH/BH nights have no overlap on Wednesday further insulating them.  3.  One in CAP and one in OB tailors to their strengths.  4.  Jason Carter has received lots of feedback about not learning in the OB space and he had no operators on his shift and with Jason being new he needed a team to help him learn - I can only learn as fast as my team is.  Lamant and Tom Smottridge were joining the OB team - those two needed to be on FHD together to learn from each other, teach Jason Carter and help the AMs. In short it was a move to get technical operators on day shift and also removing a problematic situation.

Did you witness any interactions with Jason Murphy and Craig at syncs or team meetings?

Jason told him about something weird that happened at sync.  Half-baked ideas shared by Craig to the AM team that left them feeling confused and they were laughing about Craig's lack of organization.  Too awkward for Jason Murphy to not say anything in one instance.

No other instances he's aware of.

## <u>CERTIFICATE OF SERVICE</u>

I, Peter S. Lubin, the undersigned attorney, hereby certify that on February 24, 2021, I caused a true and correct copy of the foregoing Plaintiff's Opposed Motion for Leave to File Third Amended Complaint to be served upon all counsel of record via the Court's CM/ECF System.

           /s/ Peter S. Lubin